# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE      )
                            )
        v.                   )      ID No. 1510018545A
                            )
ANDREW ALLEN,        )
                            )
      Defendant.       )

Submitted: December 29, 2023
Decided: April 15, 2024

*Upon Defendant Andrew Allen's Motion for Postconviction Relief*
**GRANTED in Part and DENIED in Part.**

## MEMORANDUM OPINION

Amanda D. Buckworth, Esquire, Deputy Attorney General, DEPARTMENT OF JUSTICE, 820 North French Street, 7th Floor, Wilmington, DE 19801, Attorney for the State of Delaware.

Herbert W. Mondros, Esquire, RIGRODSKY LAW, P.A., 300 Delaware Avenue, Suite 210, Wilmington, DE 19801, Attorney for Defendant Andrew Allen.

**WHARTON, J.**

# I.    INTRODUCTION

Defendant Andrew Allen ("Allen") was convicted by a jury of Home Invasion, Robbery First Degree, Assault Second Degree, Burglary Second Degree, four counts of Possession of a Firearm During the Commission of a Felony, and Conspiracy Second Degree.[1] This Court previously denied Allen's motion for judgment of acquittal.[2] Allen's convictions were affirmed on direct appeal to the Delaware Supreme Court.[3] In doing so, that Court found that this Court did not commit plain error: (1) when it instructed the jury that it could use a witness's conviction of a crime "for the sole purpose of judging that witness's credibility or believability;"[4] and (2) when it did not *sua sponte* instruct the jury that the complaining witness's testimony should be viewed with caution.[5] That court also rejected Allen's request to remand the matter to this Court for a hearing on whether the State committed a *Brady* violation*,* agreeing with the State that Allen's *Brady* argument was "mere speculation."[6]

---

[1] Allen was also charged with Possession of a Firearm by a Person Prohibited. However, that charge was severed to be tried later, and, on September 25, 2019, the State entered a *nolle prosequi* on it. *Allen v. State*, 2021 WL 3012892 n.4 (Del. Supr.).

[2] *State v. Allen*, 2019 WL 4740842, at *1 (Del. Super. July 16, 2021); Allen also unsuccessfully moved for judgment of acquittal during trial after the close of the evidence. *Id*. at *3.

[3] *Allen v. State*, 2021 WL 3012892 (Del. Supr.).

[4] *Id.* at *6.

[5] *Id.* at *7.

[6] *Id.*

1

Allen moves for postconviction relief under Superior Court Criminal Rule 61.[7]  In his motion, he raises five claims, three of which allege ineffective assistance of counsel ("IAC"), a fourth reprises his *Brady* claim, and the fifth alleges cumulative error.[8]  Of the IAC claims, one faults trial counsel for failing to call certain witnesses and the other two repackage his unsuccessful direct appeal jury instruction arguments as IAC claims.[9]  He asks the Court to grant him an evidentiary hearing on all contested issues of fact and to vacate his convictions and sentences.  After carefully considering the Motion, for the reasons set forth below, the Court **GRANTS** Allen's request for an evidentiary hearing, but only on two issues: (1) Trial Counsel's failure to call certain witnesses; and (2) Allen's *Brady* claim.  In all other respects, the Motion is **DENIED**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The facts, as summarized by this Court's opinion on Allen's Motion for Judgment of Acquittal, are as follows:

> Allen and his co-defendant, Jeremy Clark, were indicted on January 4, 2016 on charges of Home Invasion, Robbery First Degree, Assault Second Degree, Burglary Second Degree, four counts of Possession of a Firearm During the Commission of a Felony, and Conspiracy Second Degree. The charges stemmed from an incident

---

[7] Mot. for Postconviction Relief, D.I. 87; This case was originally assigned to another judge on the Court. On May 15, 2023, this case was reassigned to this judge.
[8] *Id.*
[9] *Id.*

2

that took place on July 15, 2015 at a home in Wilmington, Delaware. Clark and Allen were not tried at the same time because Allen was not arrested until after Clark's trial. In September 2016, a jury found Clark not guilty of all the indicted charges. On November 20, 2018, after a five-day trial, a jury convicted Allen of all the charges against him. Allen filed a timely motion for judgement of acquittal.

At trial, the State presented evidence that Clark and Allen forced their way into a residence on July 15, 2015 and committed various crimes in the residence before fleeing. Troy Williams testified for the State that he was at home alone on July 15, 2015 at approximately 1:00 p.m. when he heard a knock on his front door. From the window, Williams saw a man at the front door holding a pizza box and wearing a Yankees baseball cap. Williams also saw a white Chevrolet sedan with a New York license plate parked in his driveway. Believing the person at the door was a delivery man who came to the wrong address, Williams opened the door. The individual outside then displayed a firearm and attempted to force his way into the home. Williams resisted, but had trouble maintaining his footing because pizza had spilled onto the floor during the struggle. The individual outside ultimately gained entry with the assistance of a second man.

Williams testified the two assailants forced him to the floor at gunpoint and duct taped his legs together and his hands behind his back. One of the assailants then guarded Williams at gunpoint while the other searched the home. When Williams attempted to move, the guard struck Williams in his head and ear with the firearm. The two assailants searched the home and repeatedly demanded Williams tell them where his drugs and money were hidden. During the search, Williams overheard portions of a phone conversation between the assailants and a third individual, who Williams perceived was giving the two assailants instructions. The two assailants also threatened to wait until Williams' wife returned home

3

from work, insinuating that Williams would reveal the location of his drugs and money once his wife's safety was in jeopardy.

The threats about his wife prompted Williams to attempt to fight back. After persuading his guard to move him from the floor to a chair, Williams broke free of the duct tape that was binding him and grabbed a gun that one of the men had left lying on the desk. The gun, however, would not fire, and Williams continued to struggle with the two assailants before breaking free and running upstairs. Williams then retrieved a revolver hidden in his bedroom, started running back downstairs, and began firing at the two assailants, who were running out of the house. One of Williams' shots embedded in the floor of the entryway.

Williams believed it was possible another of the shots hit one of the assailants. He observed the two assailants flee to the white Chevrolet that he previously saw in his driveway, at which point the car quickly drove away. After the men fled, Williams first called his wife at work and told her to come home immediately. Williams then called his close friend. Approximately 10-15 minutes after the two assailants left, Williams called the police. After police and an ambulance arrived, Williams received medical attention for the injuries caused when he was struck with the gun and during his struggle to get away from the two assailants.

The defense cross-examined Williams to cast doubt on his credibility. Williams acknowledged he previously was convicted of a felony drug-related offense and lost his job as a Chester City firefighter as a result. Williams again admitted during cross-examination that he was not forthcoming with police about the fact that he fired a gun at the fleeing assailants, explaining he was hesitant to be truthful because he knew he was not supposed to possess a firearm as a result of his past felony conviction. Williams testified it was not until approximately six

4

weeks after the incident that he told police he fired at, and likely hit, one of the assailants. The defense also questioned Williams regarding his finances, specifically his wherewithal to maintain his lifestyle exclusively on income from his rental properties and his wife's job. Williams' testimony revealed that he paid off the mortgage on his home in five years and he owned various other rental properties that he managed. Williams and his wife also owned four vehicles and had a pool installed at their home. The defense suggested to the jury that the only possible explanation was that Williams was dealing drugs to supplement his legal sources of income.

Although Allen's pending motion focuses exclusively on Williams' credibility, Williams' testimony was not the State's only evidence. The jury also heard evidence during the State's case regarding the Delaware State Police investigation. Detective Timothy Harach of the Delaware State Police processed the crime scene, including taking pictures and collecting evidence. Detective Harach found duct tape pieces on Williams' legs and wrist, in the office, and in Williams' upstairs bedroom. The detective also found several pizza slices on the hall floor along with a [torn] pizza box. Police located a roll of duct tape and two firearm magazines in the office and a bullet in the entryway floor near the front door. In the laundry room, police also found a cell phone belonging to Jeremy Clark. Detective Harach processed the duct tape roll and the pizza box for fingerprints and found possible useable prints on both items. The detective then sent those items to the State Bureau of Identification for further processing and investigation.

Anthony DiNardo, a fingerprint examiner, testified that he matched Clark's fingerprint to the fingerprint recovered from a piece of duct tape and matched Allen's fingerprint to the fingerprint on the pizza box. DiNardo testified he was 100 percent certain about both matches.

5

The jury also heard evidence regarding cell tower records for Allen's phone and a forensic examination of the cellphone found at the scene. The cell tower records showed that Allen's phone hit off a tower in Philadelphia in the morning of July 15, 2015, and between 10:46 a.m. and 2:49 p.m. Allen's phone repeatedly hit off a cell tower near Williams' residence. At 2:57 p.m., the phone hit off a tower north of the tower near Williams' residence, indicating the phone was moving in a northerly direction. At 3:33 p.m. and 3:58 p.m., Allen's phone hit off cell towers in the Philadelphia area.

Police also analyzed the phone left in Williams' home and discovered it belonged to Clark. After forensically examining the phone, investigators found text messages and phone calls between Clark and Allen, along with communications between Clark and two other individuals, "Sadiqq" and "Gees 2." There were numerous communications between Clark and those three individuals on the day of incident, including a message Clark sent to Gees 2 that stated, "Tape and rope."

At the close of the State's evidence, Allen made an oral motion for judgment of acquittal, arguing the State failed to present a prima facie case that Allen committed any of the charged crimes as opposed to merely being present at the scene. The Court denied that motion, finding the State presented sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Allen committed the charged crimes either as a principal or as an accomplice.

The defense's theory of the case, offered largely through Jeremy Clark's testimony, was that the July 15, 2015 incident at Williams' home was a drug deal gone awry. Clark testified that Williams was Clark's cocaine supplier and that on July 15, 2015, Clark purchased a large quantity of cocaine from Williams for approximately $10,000. Clark explained that he brought Allen along

6

with him for the purchase in order to introduce Allen to Williams. Clark testified that he and Allen went to Williams' home that morning, purchased the cocaine, waited for Williams to count the money, and then Clark and Allen drove back to Pennsylvania to give the cocaine to Clark's uncle, Sadiqq, who "cooked" the cocaine to make crack cocaine for street sales.

Clark further testified that while he was at Sadiqq's house, Williams called Clark and demanded he return to Williams' home immediately because there was a "discrepancy." Clark stated he returned to Delaware with Allen and a second friend nicknamed "Gees." While Gees and Allen waited in the car, Clark entered Williams' home, where Williams accused Clark of using counterfeit money to purchase the cocaine that morning. Williams demanded that Clark pay $5,000 cash immediately. Clark testified Williams became enraged and threatened Clark with a gun, at which point Clark called his uncle and allowed Williams to speak with him. Williams purportedly did not return Clark's phone and instead began restraining Clark with duct tape. The two men struggled during this encounter, and Clark testified he struck Williams' head with the scale that Williams previously used to weigh the cocaine. Clark ultimately freed himself from the duct tape and ran out of Williams' residence as Williams was firing a gun at him.

Clark was shot one time in his shoulder but fled to the car where Allen and Gees were waiting. Allen and Gees drove Clark to Temple University Hospital in Philadelphia, where he was treated and released. While at the hospital, Clark was questioned by Philadelphia police regarding the origins of the gunshot wound. Clark lied and said he was shot by an unknown assailant while walking through Philadelphia.

To explain the State's fingerprint evidence, Clark testified there was a pizza box on Williams' desk that Allen picked up and moved to give Williams room to count the money

during the initial drug purchase. As to the "tape and rope" text message Clark sent on the morning of July 15, 2015, Clark explained that Williams called Clark that morning and asked him to bring duct tape and rope with him to the house. Clark said he tried to make a shopping list on his phone, but accidently created a text message to Gees instead.

The State cross-examined Clark about his past felony convictions. Clark also admitted on cross-examination that after the July 15, 2015 incident, he sent his then-girlfriend to pay Williams money. Clark denied he was trying to bribe Williams and testified he simply was trying to repay Williams the money that Williams believed he was owed. Clark also acknowledged that he saw all the police reports and evidence in the case before testifying.

In its rebuttal case, the State offered a videotaped statement that Allen gave the State police on July 25, 2017. Through that statement, the State pointed out several inconsistencies between Clark's and Allen's versions of the events of July 15, 2015. The inconsistencies included that: (1) Allen stated he met Clark through an individual named Mike, while Clark denied knowing anyone named Mike; (2) Allen told police he and Clark stopped for pizza and cheesesteaks before going to Williams' house on the morning of July 15, 2015, but Clark denied ever doing so; (3) Allen denied ever entering Williams' home, but Clark insisted Allen was in the home that morning and picked up a pizza box from the desk; (4) Allen said only he and Clark drove to Williams' home, but Clark testified Gees was with them; (5) Allen said he and Clark only went to Williams' home once, but Clark said they visited on two separate occasions that day; (6) Allen denied knowing Clark was involved with any drugs other than marijuana, but Clark testified Allen was present when Clark

purchased cocaine from Williams and when Clark later gave the cocaine to Sadiqq to "cook."[10]

At the close of the State's evidence, Allen moved orally for judgment of acquittal, arguing the State failed to present a prima facie case that Allen committed any of the charged crimes as opposed to merely being present at the scene.[11] The Court denied that motion, finding the State presented sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Allen committed the charged crimes either as a principal or as an accomplice.[12] Allen was convicted by the jury on all charges.[13]

In his motion for judgment of acquittal filed after conviction, Allen asked the Court to conclude that there were "irreconcilable inconsistencies" in the State's case.[14] Allen argued that Williams: (1) had financial resources beyond his reported income; (2) did not immediately call the police after the assailants fled the scene; and (3) did not tell police for several weeks that he fired a gun at the assailants.[15] The Court denied this motion for judgment of acquittal as well, writing:

> Assuming the jury concluded the victim was credible, the State's evidence was not irreconcilably inconsistent and was more than sufficient to sustain Allen's conviction beyond a reasonable doubt. Determining witness

---

[10] *State v. Allen*, 2019 WL 4740842, at *1-4 (Del. Super. July 16, 2021).
[11] *Id.* at *3.
[12] *Id.*
[13] Allen's Trial Tr. (November 20, 2018) at 178-79, D.I. 69.
[14] *State v. Allen*, 2019 WL 4740842, at *1 (Del. Super. July 16, 2021).
[15] *Id.*

9

credibility solely is the province of the jury, and - except in rare circumstances not present here - the Court may not disturb those determinations through a judgment of acquittal.[16]

Next, Allen appealed to the Delaware Supreme Court.[17] Allen argued that: (1) the Superior Court committed plain error by instructing the jury that evidence of Williams' prior felony conviction "could be used 'solely' for general credibility, as set forth in Del. Rule of Evidence 609, precluding its use as a predicate for proof of the complainant's bias, motive and incentive to lie, thus abridging appellant's rights to due process, confrontation and trial by jury[;]"[18] (2) the Superior Court committed plain error by not *sua sponte* "giving an instruction that, because the complainant had a penal interest in testifying favorably for the State, his testimony should be considered with great care and caution, abridging appellant's rights to due process, confrontation and trial by jury[;]"[19] and (3) alternatively, the case "should be remanded for an evidentiary hearing on whether the State violated *Brady* by failing to disclose any consideration, tacit or express, given to [the

---

[16] *Id.*

[17] *Allen v. State*, 2021 WL 3012892 (Del. Supr.); Trial Counsel represented Allen through his motion for judgment of acquittal and sentencing. Allen's current counsel represented Allen during his direct appeal to the Supreme Court.

[18] *Id.* at *1.

[19] *Id.*

complainant] in exchange for his testimony."[20]   The Delaware Supreme Court found no merit to Allen's claims and affirmed this Court's judgment.[21]

Now, Allen moves for postconviction relief under Rule 61.[22]  On September 1, 2022, Allen filed his motion for postconviction relief ("Motion")[23] and an appendix ("Appendix").[24]   On October 11, 2022, Allen's trial counsel ("Trial Counsel") submitted an affidavit ("Affidavit") in response to the Motion.[25]   On December 12, 2022, the State responded to the Motion ("State's Response"), relying in part on Trial Counsel's Affidavit.[26]  On January 18, 2023, Allen replied to the State's Response ("Reply to State's Response").[27]   On July 28, 2023, the State submitted an amended response ("State's Amended Response").[28]  On August 29, 2023, Allen submitted his reply to the State's Amended Response ("Reply to State's Amended Response").[29]   Oral argument was held on September 6, 2023.[30]

[20] *Id.*
[21] *Id.*
[22] Mot. for Postconviction Relief, D.I. 87.
[23] The motion is comprised of two documents, both marked as D.I. 87.
[24] D.I. 88.
[25] D.I. 91.
[26] D.I. 92.
[27] D.I. 93.
[28] D.I. 99.
[29] D.I. 100.
[30] D.I. 101.

On December 29, 2023, Allen supplemented the record with Jeremy Clark's ("Clark") trial transcript.[31]

## III. THE PARTIES' CONTENTIONS

### A.    Allen's Motion for Postconviction Relief (Form and Memorandum).

The Motion is comprised of both the standard Rule 61 form motion ("Form") and a memorandum ("Memorandum").[32]  The Form includes identical arguments as to Claims 1-3 of the Memorandum.  As space was limited, the Form only references Claims 4-5 of the Memorandum.  The Memorandum is comprehensive of the Form.  For practical purposes, the Court addresses the Motion as to the Memorandum.

The Form, as completed by Allen's current counsel, is *not* a *pro se* form.[33] Allen's current counsel created and signed the Form on behalf of Allen with his authorization.[34]  Allen's current counsel filed the Form in an abundance of caution because he did not find any authority indicating that a counseled movant was excused from filing a form.[35]

---

[31] D.I. 106.
[32] *See* Motion for Postconviction Relief, D.I. 87.
[33] Allen's Letter to the Court dated June 14, 2023, at 1, D.I. 105
[34] *Id.*
[35] *Id.*

12

On August 1, 2022, both documents comprising the Motion were properly served to the Attorney General's Office.[36] The Deputy Attorney General assigned to this case only had the Form in her possession because of a staffing transition.[37] Upon realizing this mistake, the State requested that the Court allow the submission of an amended response to fully respond to the Motion.[38] Allen's current counsel did not object.[39] The Court approved the submission of the State's Amended Response and Allen's Reply to the State's Amended Response.[40]

Allen moves for postconviction relief under Rule 61.[41] He asks the Court to grant him an evidentiary hearing on all contested factual issues, vacate his convictions and sentences, and grant him a new trial.[42] Allen's Motion lists five claims: Claims 1, 3 and 4 are IAC claims; Claim 2 is an alleged *Brady* violation; and Claim 5 is based on the cumulative impact of both the IAC claims and the alleged *Brady* error. In Claim 1, Allen contends that "Trial Counsel was ineffective under the Sixth Amendment and Article I, Section 7 of the Delaware Constitution for failing to introduce evidence, provided in discovery (and at Clark's earlier trial), that powerfully corroborated the defense theory that Clark was the only

---

[36] *Id.* at 2.
[37] State's Email to the Court dated June 13, 2023, D.I. 104.
[38] *Id.*
[39] Allen's Letter to the Court dated June 14, 2023, at 1, D.I. 105
[40] Oral argument was rescheduled as well.
[41] Mot. for Postconviction Relief, at 1, D.I. 87.
[42] *Id.* at 3.

person inside Williams' home on the afternoon of July 15, 2015."[43] Allen contends that Trial Counsel was ineffective in failing to introduce evidence from two witnesses who called 911, arguing that: (1) Trial Counsel's performance was deficient because it was inexplicable and indefensible for him to have relied exclusively on Clark's testimony, when the witnesses would have effectively corroborated Allen's account of the events;[44] and (2) Allen has been prejudiced because the witnesses' testimony "would have revealed the defense theory as the most plausible account; ***and ultimately as the truthful account***."[45] Next, he claims Trial Counsel was ineffective in failing to introduce evidence that Williams' made an unprompted admission that only Clark entered Williams' house.[46] He argues that: (1) Trial Counsel performed deficiently by not reviewing the record to find and/or present evidence of Williams' interview statement; and (2) Allen was prejudiced because there is a reasonable probability that the evidence would have acquitted Allen.[47]

In Claim 2, Allen contends that the State violated Allen's due process rights under the Fourteenth Amendment by failing to disclose that police told Williams

---

[43] *Id.* at 20.
[44] *Id.* at 30-31.
[45] *Id.* at 32. (emphasis in original.)
[46] *Id.* at 35-37.
[47] *Id.* at 38-39.

that he would never be charged.[48]   Allen argues that this non-disclosure was material.[49]

In Claim 3, Allen contends that "Trial Counsel was ineffective under the Sixth Amendment and Article I, Section 7 of the Delaware Constitution, for failing to object to the trial court's instruction that [Williams'] 2007 felony conviction could be used 'solely' for general credibility, as set forth in Del. Rule of Evidence 609, precluding its use as a predicate for proof of Williams' bias, motive and incentive to lie, thus abridging Allen's rights to due process, confrontation and trial by jury."[50]  Allen argues that: (1) "Trial Counsel performed deficiently by failing to object to the instruction, and request that the jury be told that it can consider Williams' prior felony conviction in assessing whether Williams' may have a secondary motive to testify consistent with the trial theory of the prosecuting authority that is authorized to prosecute him;[51] and (2) Allen was prejudiced because the instruction was an incorrect statement of law that harmed Allen's credibility battle in his defense against Williams' account of the incident.[52]

In Claim 4, Allen contends that "Trial Counsel was ineffective under the Sixth Amendment and Article I, Section 7 of the Delaware Constitution for failing

---

[48] *Id*. at 40.
[49] *Id*. at 46.
[50] *Id*. at 50.
[51] *Id.* at 51.
[52] *Id*. at 58.

to request an instruction that, because [Williams] had a penal interest in testifying favorably for the State, his testimony should be received with great care and caution[,]" and "[Trial] Counsel's failure to do so had abridged Allen's rights to due process, confrontation, and trial by jury."[53] Allen then argues that: (1) Trial Counsel performed deficiently by not requesting an "interested witness" instruction which the Court would have been obliged to give under the Sixth Amendment;[54] and (2) this performance deficiency prejudiced Allen because Williams' testimony "was the primary evidence relied upon by the State, trial counsel was ineffective for failing to request that the trial court caution the jury that it should have received that biased, incentivized testimony 'with caution.'"[55]

In Claim 5, Allen contends that the cumulative impact of Trial Counsel's ineffectiveness and the *Brady* violation, establishes that, but for those errors, there would have been a reasonable probability of a different outcome at trial.[56]

**B.     Trial Counsel's Affidavit.**

Trial Counsel writes in his Affidavit:

> Trial counsel carefully reviewed the police reports, 911 calls, expert fingerprint report, and all other evidence that linked Mr. Allen and Mr. Clark to being inside [Williams' home]. The possible fact that the witnesses saw one person wearing a bloody shirt get in a car does not

---

[53] *Id.* at 60.
[54] *Id.* at 62-63.
[55] *Id.* at 65.
[56] *Id.* at 66.

necessarily corroborate that there was only one person inside [Williams' home] while a confrontation occurred therein. Co-defendant Clark testified that Allen entered [Williams' home] and moved a pizza box on the desk in Williams' office. That accounted for Allen's fingerprints being found at the scene, inside the house.[57]

…

At Mr. Allen's trial, the State presented evidence that Mr. Allen was in [Williams' home] at some point after or during the delivery of a pizza. Specifically, his fingerprint was found on a pizza box inside the house. In trial counsel's view, presenting evidence that corroborated some of the physical evidence presented by the State, while showing that Mr. Allen was not involved in any criminal activity, would have been more believable to the factfinder. Presenting a case tending to suggest that Mr. Allen was never inside [Williams' home] would not have been as effective, in counsel's view, than the course that trial counsel elected to take in calling Clark as a witness and eliciting testimony that Allen moved a pizza box, thereby harmlessly explaining the presence of his fingerprint on the box.[58]

Trial Counsel then confirms that the State never disclosed any promise to not prosecute Williams for the crime of possession of a firearm by a person prohibited ("PFBPP") or any other crime arising out of the incident that formed the basis of this case.[59] Additionally, Trial Counsel confirms that "he was never advised by the State that Williams' would never be charged because he was a victim."[60] Trial Counsel states that if this *Brady* material been disclosed to him prior to trial, he

---

[57] Trial Counsel's Aff., at 9, D.I. 91.
[58] *Id.* at 9-10.
[59] *Id.* at 10.
[60] *Id.*

17

"would have brought these promises to the attention of the jury and questioned Williams, Detective Rizzo, and any other related individuals about it."[61]  Trial Counsel also points out that: "the jurors were given a general credibility instruction permitting them to consider witness's motivation, bias, prejudice, and interest[.]"[62] Trial Counsel then writes:

> During cross-examination of witness Williams, trial counsel elicited an admission from Williams that he lost his job as a paid firefighter around the time he was convicted of the felony drug offense in 2007. Trial counsel sought to convey to the jury the seriousness of the conviction, and that Williams' lost his job because of it. The State objected to questioning pertaining to the issue. The trial court sustained the State's objection and trial counsel abided by the Court's ruling. Thus, trial counsel did seek to explore the seriousness of the conviction and highlight to the jury that the conviction was serious and must be considered in evaluating the weight to which it would give Williams' testimony. In this regard, trial counsel's performance was not deficient. Whether Mr. Allen received a specific bias instruction or not, trial counsel highlighted that the jury ought to give less weight to Williams' testimony in light of the 2007 conviction.[63]

Trial Counsel asserts that the substance of Claim 4 is similar to the argument in Claim 3, although that claim dealt with a different jury instruction.[64]  However, Trial Counsel still addresses this claim, writing:

---

[61] *Id.*
[62] *Id.* at 11 (quoting Mot. for Postconviction Relief, at 56).
[63] *Id.* at 11-12 (internal citations omitted).
[64] *Id.* at 12-13.

> [A]s witness Williams was not a co-defendant/accomplice who was testifying against another co-defendant, if trial counsel had requested a *Bland* instruction, the trial court would have applied the governing law and most likely would have concluded that a *Bland* instruction was not appropriate. Mr. Allen further cites the Model Jury instruction for a witness who has pleaded guilty to the same or related offense, accomplices, immunized witness, or cooperating witnesses. Respectfully, based on the evidence adduced at trial, the trial court would have determined that witness Williams did not meet the criteria to classify as any of those types of witnesses. Accordingly, any request for a jury instruction for such a witness more likely than not would have been denied.[65]

## C.     The State's Response.

The State responds that Allen's Motion is procedurally barred under Rule 61(i)(1) because it was not filed within one year of the final judgment of conviction.[66] Additionally, the State argues that Claim 2 – the *Brady* claim - is procedurally barred pursuant to Rule 61(i)(4) because it was adjudicated previously on direct appeal to the Delaware Supreme Court.[67] The State substantively addresses only Claims 1 and 3. Here, the State reiterates Trial Counsel's argument:

> Trial counsel explained that he carefully reviewed all evidence in this case, including 911 calls, and strategically decided to refrain from presenting the 911 calls as evidence a[t] trial. Trial counsel went on to

---

[65] *Id.* at 13.
[66] State's Resp., at 3, D.I. 92.
[67] *Id.*

19

explain that, in his opinion, presenting a defense that [Allen] was not inside the victim's home at the time of the offense would not have been effective as there was other physical evidence, including a fingerprint, that showed [Allen] was inside the victim's home at some point.[68]

The State also reiterates Trial Counsel's argument that regardless of whether Allen "received a specific bias instruction or not, trial counsel highlighted that the jury ought to give less weight to Williams' testimony in light of the 2007 conviction."[69] Lastly, the State points out that the Delaware Supreme Court also addressed this same argument on direct appeal and found that the trial judge did not commit plain error.[70]

**D.     Allen's Reply to the State's Response.**

Allen's Reply to the State's Response argues that the State is incorrect in asserting a procedural bar due to Allen not filing the Motion within one year of the final judgment of conviction.[71] Allen reasons that a judgment of conviction becomes final on the date after the direct appeal process is complete – the date the mandate is issued.[72]

---

[68] *Id.* at 4 (citing Trial Counsel's Aff., at 9).
[69] *Id.* at 5 (quoting Trial Counsel Aff., at 12).
[70] *Id.* at 5; The State does not argue that Claim 3 should be procedurally barred under Rule 61(i)(4).
[71] Reply to State's Resp., at 1, D.I. 93; Allen also points out that some of his claims have not been addressed. The State's Amended Response addresses those unaddressed claims in the Motion. *See infra*, at 22-25.
[72] Reply to State's Resp., at 2, D.I. 93

Allen contends that the State mischaracterizes his argument that Trial Counsel was ineffective in not calling certain witnesses because the "'defense that the defendant was not inside the victim's home at the time of the offense' ***was the very defense that trial counsel presented***."[73]  Allen also rejects the State's suggestion that the evidence proffered in the Motion is "vague."[74]  Allen does not take issue with Trial Counsel's strategy, endorsed by the State, of "harmlessly explaining the fingerprint on the pizza box" by Allen's presence in Williams' home that morning.[75]  Instead, Allen points out that the disinterested witnesses' testimony would have advanced and profoundly strengthened Trial Counsel's theory, meanwhile, the explanation of the fingerprints would have been unaffected.[76]  Allen asserts that his *Brady* claim should not be barred because the State cannot be permitted to profit from its suppression of evidence, and the nature of this *Brady* claim has not been previously litigated due to its different factual and legal basis.[77]  Additionally, Allen contends that the Delaware Supreme Court's ruling on direct appeal, which did not find plain error, does not operate as an impediment to *Strickland* review because *Strickland* review and plain error are different standards

---

[73] *Id.* at 2-3 (quoting State's Resp., at 4).
[74] *Id.* at 4.
[75] *Id.* at 4 (quoting State's Resp., at 5).
[76] *Id.* at 4.
[77] *Id.* at 6.

in both degree of error and degree of impact.[78]  Lastly, Allen reiterates that even though Trial Counsel highlighted Williams' 2007 conviction, it was not a substitute for an instruction that comes from the Court.[79]

**E.    The State's Amended Response.**

First, the State's Amended Response addresses Rule 61's procedural bars and Allen's state constitutional claims.  As to the Rule 61 procedural bars, the State argues:

> Because Allen's postconviction motion is his first and is timely, this Court can consider the ineffective assistance of counsel claims because the first time such claims can be raised is on postconviction. Even so, Allen's claims should be dismissed without further proceedings because … his claims of ineffective assistance of counsel are without merit. As to Allen's other claims, they are procedurally barred under Rule 61. In any event … all of Allen's claims are meritless.[80]

On Allen's claims based in part on the Delaware Constitution, the State argues that these specific claims have been waived and should be summarily denied because they are conclusory.[81]

The State argues that Allen has failed to demonstrate Trial Counsel was deficient because: (1) "Trial counsel's decision to refrain from introducing the 911 calls and Williams' statement during his August 2015 interview falls within the

---

[78] *Id.* at 6-7.
[79] *Id*. at 7.
[80] State's Am. Resp., at 15, D.I. 99.
[81] *Id*. at 16-17.

wide range of professional assistance[;]"[82] and (2) "Trial counsel's decision is entitled to a strong degree of deference and the decision to do so was not unreasonable."[83] Additionally, the State argues that even if Trial Counsel had presented testimony from the two 911 callers, as well as Williams' statement to Det. Rizzo, Allen cannot show that the trial outcome would have been different.[84]

The State then contends that Allen's *Brady* claim is procedurally barred under Rules 61(i)(3) and (4) because Allen did not raise it in the proceedings leading to the judgment of conviction, and this issue has been previously adjudicated by the Supreme Court.[85] Further, the State contends that Allen has not met the standard for various Rule 61 exceptions.[86] The State asserts that Allen has not alleged that the trial court lacked jurisdiction over his convictions and sentence, nor has he identified the existence of a new, retroactively applicable rule of constitutional law.[87] Additionally, the State asserts that Williams' statements to Allen's private investigator do not constitute newly discovered evidence and the proffered evidence does not create a strong inference that Allen is actually innocent.[88] The State maintains that Allen has failed to establish a *Brady* violation

---

[82] *See id*. at 24.
[83] *Id.*
[84] *Id.* at 26.
[85] *Id.* at 33.
[86] *Id*. at n.66; *Id* at n.68 and associated text.
[87] *Id.* at 35.
[88] *Id*. at 36, 42.

because Allen has not established that the State suppressed evidence.[89] Additionally, the State argues that Allen has not established that an agreement existed between Williams and the State, tacit or otherwise, at the time of trial.[90]

The State addresses Allen's jury instruction claims on the merits. The State first asserts that Trial Counsel's representation was not deficient in failing to object to the Court's instruction pertaining to the victim's 2007 felony conviction because he had no basis to object and this claim is "meritless."[91] The State then argues that Allen cannot show prejudice because there is not a reasonable probability that the trial's outcome would have been different had the instruction been requested.[92]

Next, the State argues that Trial Counsel was not deficient in not requesting an instruction that Williams' testimony should be received with great care and caution because there were no grounds for such a request.[93] Again, the State claims that Allen cannot establish prejudice because he cannot show a reasonable probability that the outcome of the trial would have been different had the instruction been requested.[94] Finally, the State argues that there can be no cumulative error because all of Allen's claims fail individually.[95]

---

[89] *See id.* at 45.
[90] *Id.* at 45-46
[91] *Id.* at 51-52.
[92] *Id*. at 60.
[93] *Id*. at 62-63.
[94] *Id*. at 70.
[95] *Id*. at 72-73.

**F.      Allen's Reply to the State's Amended Response.**

Allen argues in his Reply to the State's Amended Response that the State makes an identical meritless argument regarding the proposed introduction of the witness evidence.[96]  Again, Allen reasons that the flaw in the State's rationale is that the defense that Allen was not inside the victim's home at the time of the offense, was the very defense that trial counsel presented.[97]  Again, Allen clarifies that his claim is *not* "that trial counsel should have argued that Allen never entered [Williams' home].  Rather, the claim is that Trial Counsel failed to utilize readily available evidence supporting his own theory that Allen never entered the house that afternoon when the alleged crime occurs."[98]  Allen disputes the State's contention that the "fact that witnesses saw one person wearing a bloody shirt get in a car does not necessarily corroborate that there was only one person inside [Williams' home]," arguing that either Williams or the witnesses necessarily must have lied.[99]  Allen believes that the jury would have had little difficulty resolving the credibility battle between Williams and the witnesses in favor of the witnesses.[100]  Additionally, Allen states that *Strickland* requires a reasonable

---

[96] Allen's Reply to State's Am. Resp., at 2, D.I. 100.
[97] *Id.*
[98] *Id.* at 3.
[99] *Id.* at 3 (quoting State's Am. Resp., at 23) (citation omitted).
[100] *Id.* at 3.

25

probability of a different result, ***not*** that there would have "necessarily" been a different result.[101]

Regarding Williams comment that he shot "the one that came in the house," Allen writes:

> Certainly, if trial counsel had listened to and/or appreciated the significance of Williams' comment, and presented it to the jury, the State would have been free to present all these implausible explanations to the jury. That fact, however, does not mean that the State's spin on what is a straightforward comment, overcomes *Strickland*'s reasonable probability standard. Perhaps the jury might have accepted the State's tortured explanations; however, [Allen] need not overcome *that* standard to merit relief.[102]

Allen also replies that the Court should reject the State's attempt to hold Allen responsible for its suppression of *Brady* evidence.[103] Allen supports this argument by contending that: (1) "the State does not contest the veracity of Williams' statement to investigator Jansen that a detective promised him that he would never be arrested for his admitted guilt to a serious felony[;]" (2) "the State does not contest that due process is violated[,] whether or not the detective promised him that he would not be arrested[] mentioned this to trial prosecutors[;]" and (3) "the State does not suggest (as complainant Williams does in the interview)

---

[101] *Id.*
[102] *Id.* at 8.
[103] *Id.*

26

that because no one said anything about a 'deal,' the detective's promise that he would never be arrested was a nonevent."[104]

Turning to jury instructions, Allen asserts that the State cannot refute the likelihood that the jury interpreted the *crimen falsi* instruction to mean what it said.[105] Allen writes:

> If the highest courts of Delaware and the United States distinguish between cross-examination directed to general credibility and cross-examination directed to motive and bias, there [is] no reason to believe that the jurors did not. Thus, an instruction arguably precluding consideration of a prior conviction for anything other than general credibility presents a reasonable probability that at least one juror would not consider the exposure presented by Williams' conviction had on his motivation.[106]

Allen replies that the State provides no rationale for Trial Counsel's failure to request an interested witness instruction, writing:

> The question of whether trial counsel should have realized the language of *Bland v. State* regarding an accomplice was applicable to an unindicted, self-admitted participant in the criminal activity, is a different question than whether the trial court, on its own should have fashioned such instruction and whether not doing so constituted error (let alone plain error).[107]

---

[104] *Id.* at 12.
[105] *Id*. at 17.
[106] *Id*. at 19-20.
[107] *Id.* at 22 (internal citation omitted).

Lastly, Allen then contends that "there is simply no basis to find that an instruction urging caution due to the witness's secondary motive to avoid arrest, conviction and incarceration, would not have created a reasonable likelihood of a different result."[108]

## IV.    STANDARD OF REVIEW

Rule 61 is the exclusive remedy for those "in custody under a sentence of this court seeking to set aside the judgment of conviction…"[109]  This Rule balances finality "against … the important role of the courts in preventing injustice."[110]

Before addressing the merits of a defendant's motion for postconviction relief, the Court must first apply the procedural bars of Superior Court Criminal Rule 61(i).[111]  If a procedural bar exists, then the Court will not consider the merits of the postconviction claim.[112]  Under Delaware Superior Court Rules of Criminal Procedure, a motion for postconviction relief can be barred for time limitations, repetitive motions, procedural defaults, and former adjudications.  A motion exceeds time limitations if it is filed more than one year after the conviction becomes final or if it asserts a newly recognized, retroactively applied right more

---

[108] *Id.* at 23-24.
[109] Super. Ct. Crim. R. 61(a)(1).
[110] *Zebroski v. State*, 12 A.3d 1115, 1120 (Del. 2010) (citation omitted).
[111] *Younger v. State,* 580 A.2d 552, 554 (Del. 1990).
[112] *Id.*

28

than one year after it was first recognized.[113]  A second or subsequent motion is repetitive and therefore barred.[114]  The Court considers a repetitive motion only if the movant was convicted at trial and the motion pleads with particularity either: (1) actual innocence;[115] or (2) the application of a newly recognized, retroactively applied rule of constitutional law rendering the conviction invalid.[116]  Grounds for relief "not asserted in the proceedings leading to the judgment of conviction" are barred as procedurally defaulted unless the movant can show "cause for relief" and "prejudice from [the] violation."[117]  Grounds for relief formerly adjudicated in the case, including "proceedings leading to the judgment of conviction, in an appeal, in a post-conviction proceeding, or in a federal habeas corpus hearing" are barred.[118] Additionally, "[t]his Court will not address claims for post-conviction relief that are conclusory and unsubstantiated."[119]

To successfully bring an IAC claim, a claimant must demonstrate: (1) that counsel's performance was deficient; and (2) that the deficiencies prejudiced the

---

[113] Super. Ct. Crim. R. 61(i)(1).
[114] Super. Ct. Crim. R. 61(i)(2).
[115] Super. Ct. Crim. R. 61(d)(2)(i).
[116] Super. Ct. Crim. R. 61(d)(2)(ii).
[117] Super. Ct. Crim. R. 61(i)(3).
[118] Super. Ct. Crim. R. 61(i)(4).
[119] *State v. Guinn,* 2006 WL 2441945, at *4 (Del. Super. Aug 16, 2021). *See also Gattis v. State*, 697 A.2d 1174, 1178-79 (Del. 1997); *Younger,* 580 A.2d at 556; *State v. McNally,* 2011 WL 7144815, at *5 (Del. Super. Nov. 16, 2011); *State v. Wright,* 2007 WL 1982834, at *1 n.2 (Del. Super. July 5, 2007).

claimant by depriving him or her of a fair trial with reliable results.[120]  To prove counsel's deficiency, a defendant must show that counsel's representation fell below an objective standard of reasonableness.[121]  Moreover, a defendant must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal.[122]  "[A] court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[123]  A successful Sixth Amendment claim of IAC requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[124]  An inmate must satisfy the proof requirements of both prongs to succeed on an IAC claim.  Failure to do so on either prong will doom the claim and the Court need not address the other.[125]

## V.    DISCUSSION

### A.    Bars to Relief.

#### 1. The Time Bar of Rule 61(i)(1).

Although the State asserted in their Response that the Motion is time-barred under Rule 61(i)(1), the State appears to have conceded that it is not in their

---

[120] *Strickland v. Washington,* 466 U.S. at 688.

[121] *Id.* at 667-68.

[122] *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

[123] *Strickland*, 446 U.S. at 689.

[124] *Id.* at 694.

[125] *Strickland,* 466 U.S. at 697; *Ploof v. State,* 75 A.3d 811, 825 (Del. 2013) ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant.").

Amended Response.[126]  The Court agrees that the Motion is not time-barred under Rule 61(i)(1).  "The limitations period begins to run on the date when the direct appeal process is complete; that is, on the date the mandate is issued."[127]  The Delaware Supreme Court issued the mandate on the direct appeal on August 3, 2021.[128]  Allen filed the Motion on August 1, 2022.[129]  Thus, the Motion is timely.

### 2.  The Former Adjudication Bar of Rule 61(i)(4).

The State contends that Rule 61(i)(4) bars Allen's *Brady* violation claim.  Rule 61(i)(4) states: "any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice."[130]

Allen did not assert a *Brady* claim in his motion for acquittal before this Court.  Instead, in his third argument on direct appeal to the Delaware Supreme Court, Allen asked that Court to remand the matter to the Superior Court to conduct an evidentiary hearing on whether the State violated *Brady* by failing to

---

[126] State's Am. Resp., at 13-15, D.I. 99.
[127] *Felton v. State*, 945 A.2d 594 (Del. 2008).
[128] Reply to State's Resp., at Ex. A, D.I. 93.
[129] Mot. for Postconviction Relief, D.I. 87.
[130] Super. Ct. Crim. R. 61(i)(4).

disclose any consideration given to Williams in exchange for his testimony.[131]  He argued that "'it is utterly improbable that no one made the decision not to prosecute'" and the facts demonstrate "'the overwhelming likelihood that Williams received an undisclosed deal in this case, and thus support granting a hearing on this claim.'"[132]  The Supreme Court declined the remand request, concluding that Allen's *Brady* claim was "mere speculation and … the record is devoid of any evidence to substantiate [Allen's] *Brady* allegation."[133]  When making his *Brady* claim on direct appeal, Allen did not have any actual evidence that the State suppressed an agreement between the State and Williams, but, rather, he argued the circumstances compelled that conclusion.

In is unclear to this Court why Allen chose to raise his *Brady* claim on direct appeal in the manner he did.  Because he lacked evidence to support his argument, he sought a remand to attempt to develop that evidence.  By figuratively dipping his toe into the *Brady* issue in this fashion, he ran the risk of an adverse adjudication procedurally barring him from ever having the opportunity to litigate the claim on its merits.

---

[131] *Allen v. State,* 2021 WL 3012892, at *7 (Del. 2021).
[132] *Id.*
[133]  *Id.*

In postconviction litigation, the State argues that the issue was resolved on direct appeal and, thus, it is procedurally barred as previously adjudicated.[134] To the extent Allen argues it was not previously adjudicated, the State maintains it barred under Rule 61(i)(3) as procedurally defaulted since the claim was not raised in the proceedings leading to Allen's conviction or on direct appeal.[135] Further, Allen cannot avoid the bars to relief because the *Brady* claim neither alleged a lack of jurisdiction by the trial court or the existence of a new, retroactively applicable rule of constitutional law, nor did it allege newly discovered facts supporting a claim of actual innocence.[136]

In his Reply to the State's Amended Response, Allen argues that the State's argument under Rule 61(i)(3) that Allen could have learned of the purported facts supporting his *Brady* claim sooner and raised the claim earlier has been rejected by the United States Supreme Court and the Third Circuit because the State has a due process obligation of disclosure even where defense diligence could have uncovered the material.[137] Moreover, Allen maintains that suppression of an explicit assurance by Det. Rizzo that Williams would not be charged is sufficient

---

[134] State's Am. Resp., at 30-44, D.I. 99.
[135] *Id.* at n. 66.
[136] *Id.* at 33-44.
[137] Reply to State's Resp., at 9-10 (citing *Banks v. Dretke,* 540 U.S. 668 (2004); *Dennis v. Sec'y Dep't of Corr.,* 834 F.3d 263 (3d Cir. 2016); *Bracey v. Sup't Rockview, SCI,* 986 F.3d 274 (3d Cir. 2021)), D.I. 100.

33

cause to excuse the procedural default and, further, the materiality of that assurance is unchallenged.[138]

Accepting all of the foregoing as correct, Allen still must contend with the State's argument under Rule 61(i)(4). He does so by first arguing that the State has not contested that there was an express agreement with Williams not to prosecute him for illegally possessing a firearm,[139] and, second, by asserting that the underlying issues raised on direct appeal and here are not the same.[140]

Both arguments miss the mark. As to the first, the State simply does not accept the premise that Allen has established any agreement at all - "Williams' remarks to Allen's investigator over the phone – approximately seven years after the incident and after Williams was interviewed by the police – do not establish the existence of any deal, promise, or *quid pro quo* or establish that Williams was given any consideration for his testimony."[141] As to the second, the underlying claim was exactly the same on direct appeal as it is here – that the State violated its *Brady* obligations by failing to disclose an agreement between it and Williams not to prosecute Williams for illegally possessing a firearm in exchange for his testimony.

---

[138] *Id.* at 11.
[139] *Id.* at 12.
[140] *Id.* at 13-17.
[141] State's Am. Resp., at 47, D.I. 99.

As the Court previously observed, it is unclear why Allen raised the *Brady* issue on direct appeal without any evidentiary support in the record. Certainly, as he persuasively argues here, Rule 61(i)(3) would not bar him from raising it on postconviction relief if he were able to develop such a record. Nevertheless, raise it he did, and so the Court must consider whether Rule 61(i)(4) bars him from raising it again here. The Court finds the bar of Rule 61(i)(4) inapplicable. The Supreme Court did not address the underlying merits of Allen's substantive *Brady* claim – in fact, there were none - but concluded under the plain error standard that the claim was speculative.[142] By raising the *Brady* issue prematurely on direct appeal, appellate counsel, who also is postconviction counsel, risked precluding Allen from raising it now. Because the Court finds Rule 61(i)(4) inapplicable and in an effort to forestall any future IAC claim against appellate counsel in the event it ultimately is determined that Rule 61(i)(4) is applicable, Allen's request for a hearing is **GRANTED**. In that way, the Court intends to develop a better record upon which to consider the claim and ultimately decide it.

### B.    Ineffective Assistance of Counsel Claims.

All three IAC claims reference both the Sixth Amendment of the United States Constitution and Article I, Section 7 of the Delaware Constitution.[143] The

---

[142] *See, State v. Jones,* 2022 WL 2827004, at *7 (Del. Super. Ct. Jul. 20, 2022) (citing *Green v. State*, 238 A.3d 160, 176 (Del. 2020)).

[143] Allen's *Brady* claim is grounded only in the United States Constitution.

Motion's references to the Delaware Constitution, however, are limited to conclusory headings.[144] Finding no substantive IAC argument based on the Delaware Constitution, the Court addresses Allen's *Strickland*-based IAC claims only as to the Sixth Amendment of the United States Constitution.

### 1. Failure to Introduce Exculpatory Evidence.

Allen's first IAC claim concerns Trial Counsel's failure to introduce allegedly exculpatory evidence that Clark was the only person inside Williams' home on the afternoon of July 15, 2015.[145] The allegedly exculpatory evidence included: (1) two 911-callers who witnessed Clark alone on Foulk Road on the day of the home invasion, July 15, 2015; and (2) a statement Williams made to Det. Rizzo during an interview on August 28, 2015.[146]

### a. 911-Callers.

During Clark's trial, Williams testified as to his account of Allen and Clark fleeing his home:

> WILLIAMS: I hear my front door open and I think - - when the front door open [sic] I think that they're about to let the third - - they're yelling for the third guy to come help us because this guy got out of control and he's fighting us, we need more help.[147]

---

[144] Mot. for Postconviction Relief at 20, 50, 60, D.I. 87.
[145] *Id.* at 20-21.
[146] *Id.*
[147] Clark's Trial Tr. (September 21, 2016) at 81, D.I. 106.

36

So when I hear my front door open, I immediately turn - - I come up, I turn my - - come around the corner and I'm looking down my stairwell. And when I look down my stairwell, I see somebody pop out of my office and I just left [sic] off, boom, boom, boom. I shoot three times and they run out the door.

I run down the steps behind them and I run out the door behind them. And when I run out the door, they're running across my front lawn which leads to Foulk Road. And they cross Foulk Road. And by this time, there's the same white car that was parked in my driveway when they dropped them off is across the street in a medical complex. He's backing out of the parking spot and he's coming down the hill to Foulk Road.

They run across Foulk Road, they get in that car and they turn and make a left - - well, they make a right on their right and they go down toward Silverside Road.[148]

…

MS. GATTO: And from the time that you started firing to the time that - - did they - - were they - - did they wait in the house, did they leave immediately, did they leave a little later? Do you know how long it was after you fired that they left the house?

WILLIAMS: Oh, they were running out of the house after I started - - after I was firing.

MS. GATTO: So the vehicle - - you said that you saw both of them run to a vehicle?

WILLIAMS: Yes.[149]

…

---

[148] *Id.* at 82.
[149] *Id.* at 94.

MS. GATTO: Were you able to tell while you were watching them which - - where the two ended up entering the car? Did you see them actually enter the car?

WILLIAMS: I did but, no, I didn't make note of which one got in which space.

MS. GATTO: But you saw them both enter?

WILLIAMS: They both got in that car and drove off, yes.[150]

MS. GATTO: And I know you testified, but where did you see them drive off to?

WILLIAMS: They came - - they came out of the medical center, which is - - which basically is - - it's not directly across the street from my house, but it's - - he's next door to the guy across the street from my house, so it's over this side.

They came down there, down out of the driveway of [sic] there and they made - - which would have been their right to my left - - and they went toward Silverside Road. I didn't see where they went after, I just know they went toward Silverside Road.[151]

During Allen's trial, Williams again testified as to his account of Allen and Clark fleeing his home:

MS. DILIBERTO: … So you went up to the bedroom, you grabbed that gun, it was still there and you said you were standing at the top of your stairwell?

WILLIAMS: I was standing in the doorway of my bedroom, which - - standing in the doorway of my

---

[150] *Id.* at 95.
[151] *Id.* at 96.

bedroom, it's a wall there but on the other side of that wall is a stairwell that comes down the steps back downstairs. So I'm standing there with the gun holding it, waiting for somebody to come upstairs.

Instead, I hear my front door open and I don't know if they are either leaving, coming, I don't know if they went and got the other guy who brought the phone to the door, his backup to come get me, so I immediately spinned around - - and I'm standing at the top of the steps now. And when I'm standing at the top of the steps, I see the guy with the white Jordans come out of my office and he's standing at the front door. And the guy with the Yankee's cap is standing outside on the steps saying: Come on. Come on. Come on.

As I come down the steps, I come down the steps and I shoot three times: Boom, boom, boom. I don't know if I hit him at the time or not, but I shot three times going down the steps. They both - - he ran out of the door and both of them ran across my lawn towards the - - it's an office complex, doctors office across the street with a parking lot. And they were running across my yard and then across Foulk Road up the hill to the doctor's office where I assumed there was a car parked.

So now I come down from the steps behind them and come out the front door. And I'm standing on the steps yelling, just yelling obscenities or whatever emotion that I was yelling at the time about them: Come back. Come back. Come back. I got you now. Whatever anger I was yelling when they were running across the street.

And then I see the same white Chevrolet with the New York plates on it, it's pulling out of the doctor's office and then they both jump in that car and they pull off and they go south on Foulk Road.

MS. DILIBERTO: So the car you saw - - after you fired your gun and they ran outside, do you go outside and follow them out to see where they are going?[152]

WILLIAMS: Yeah, I'm out on the step. I don't think I went any further than my step., [sic] my stoop outside of my door, but - -

MS. DILIBERTO: Okay?

WILLIAMS: But I was [sic] definitely ran out after them.

MS. DILIBERTO: Okay. And you said you see them kind of run across Foulk Road?

WILLIAMS: Yeah, I saw them run diagonally across Foulk Road. Directly across me on Foulk Road is another house, but to the left of that house is a - - you go up a hill, it's on a raised hill and it's a little office complex right there.

MS. DILIBERTO: Did it appear to you that someone else was driving - -

WILLIAMS: Oh somebody was definitely driving. The car was moving.

MS. DILIBERTO: So this car you saw, was this, did this appear to be the same car you saw initially in your driveway?

WILLIAMS: I believe that it was the same car that I saw initially in my driveway.

MS. DILIBERTO: Okay. Was the car moving?

WILLIAMS: The car was moving.[153]

---

[152] Allen's Trial Tr. (November 15, 2018) at 43-44, D.I. 69.
[153] *Id.* at 45.

40

MS. DILIBERTO: Okay. And where was it moving toward?

WILLIAMS: It pulled out of that doctors office and it made - - that would have been making a right on Foulk Road and it went south on Foulk Road.[154]

Alexander Manoogian ("Manoogian") was one of the two witnesses who called 911. In his call, Manoogian stated that he saw a man who "had blood all over his white T-shirt and what looked like a hole in his back."[155] Manoogian added that the man ran across Foulk Road.[156] In a later interview, Manoogian indicated that he was driving north on Foulk Road and that the man was jogging south on the sidewalk to his left.[157] Manoogian emphasized that the man was alone.[158]

Lyndee Baldwin ("Baldwin") was the other witness who called 911. Baldwin's 911 call conveyed that while driving on Foulk Road she saw a man enter the backseat of a vehicle.[159] Baldwin also said that the man entered the vehicle in the middle of the road and that he had blood on his shirt.[160] During Clark's trial,

---

[154] *Id.* at 46.

[155] Appendix at A46, D.I. 88.

[156] *See id.*

[157] *Id.* at A48. Manoogian also stated that he appeared at Court and was excused upon his request. Manoogian was not sure which defendant was on trial during his appearance.

[158] *Id.*

[159] *Id.* at A45.

[160] *Id.*

Baldwin testified as a witness for the State.[161]  Baldwin's testimony included that she viewed the man as she had driven down a "little hill" on Foulk Road next to an office complex.[162]  Baldwin stated that there were two other men in the vehicle; one man was in the driver's seat and one man was in the passenger seat.[163]  Baldwin affirmed that the passenger seat was "leaned all the way back."[164]  In a later interview with Allen's private investigator, Baldwin specified that the man with the bloody T-shirt entered the backseat of the vehicle on the driver's side.[165]

Trial Counsel's affidavit appears to understand Allen's argument to be that "trial counsel should have argued that Allen never entered Williams' house."[166]  But, that is *not* Allen's argument.  Allen's argument is "that trial counsel failed to utilize readily available evidence supporting his own theory, that Allen never entered the house *that afternoon* when the alleged crime occurred."[167]  In other words, Allen's claim acknowledges that he entered the house on an earlier visit, but not at a second, later time when the alleged crime occurred.  He contends that the missing testimony of both Manoogian and Baldwin that they only saw one individual fleeing and getting into a car would have corroborated his version and

---

[161] Clark's Trial Tr. (September 21, 2016) at 3, D.I. 106.
[162] *See id.* at 4-5, 8-9.
[163] *Id.* at 9.
[164] *Id.* at 20-21
[165] Appendix at A47, D.I. 88.
[166] Allen's Reply to State's Am. Resp., at 3, D.I. 100.
[167] *Id.*

contradicted Williams' testimony. The Court believes that an expanded and more on point explanation from Trial Counsel of his decision not to call these two witnesses would be helpful to the Court. Accordingly, Allen's request for a hearing is **GRANTED** on this claim.

### b.  Williams' Statement to Det. Rizzo.

Allen argues that the jury would not have convicted Allen had the evidence of the August 28, 2015 interview between Det. Rizzo and Williams been proffered. Specifically, Allen argues that this evidence, combined with Williams' lies regarding his possession of a gun, would have led to the jury believing that the other person did ***not*** come in the house on the afternoon of the incident.[168] The interview between Det. Rizzo and Williams included the following dialogue:

> DET. RIZZO: Was this the guy, do you know, was he wearing a Yankee's hat --
>
> WILLIAMS: This wasn't the Yankee's hat one. This was the one that came in the house. That's the one that - -
>
> DET. RIZZO: Do you know why they call him "Jerm"?[169]

A review of the video of the statement makes it plain that "This was the one that came in the house" is not the "gotcha" case dispositive comment Allen thinks

---

[168] Mot. for Postconviction Relief at 39, D.I. 87.

[169] Aug. 28, 2015 video interview between Williams and Det. Rizzo, at 30:30-31:00. The transcript of the interview at A49 of the Appendix to the Motion seems to be incorrect.

it is.  It is not some sort of Freudian slip.  It is also not an isolated statement.

Williams instantly attempted to clarify what he had just said, but was unable to

when Det. Rizzo asked another question on a different topic.  Both Det. Rizzo's

conduct, and more importantly Williams' conduct, do not give the appearance that

Williams accidently revealed the "truth."  The full context of the statement and

Williams testimony at two trials makes it plain that Williams consistently described

two men coming into his house.  The Court is confident that, had Trial Counsel

questioned Williams about this comment, Williams would have placed it in its

proper context.  Further, it is entirely possible that aggressively questioning

Williams on this point would have been harmful to Allen as the jury may have seen

it as Allen grasping at straws.  Thus, not doing so was not performance deficiency.

The Court is also confident that had Trial Counsel raised the comment with

Williams, it would have had no bearing on the outcome of the trial.

### 2. Failure to Object to Jury Instructions Regarding Evidence of Williams' Prior Felony and Credibility of Witnesses.

The following two instructions were given to the jury at Allen's trial:

> Credibility of witnesses. You are the sole judges of the credibility of each witness. You decide the weight to be given to each witness's testimony. You should consider each witness's means of knowledge, strength of memory and opportunity for observation; the reasonableness or unreasonableness of the testimony; the consistency or inconsistency of the testimony; the motivations of the witness; whether the testimony has been contradicted; the bias, prejudice or interest of the

witness, if any; the manner or demeanor of the witness … upon the witness stand; and all other facts and circumstances shown by evidence that affect the credibility of the testimony.

Witness' Conviction of a Crime. You may consider evidence that a witness was previously convicted of a felony or a crime involving dishonesty for the sole purpose of judging that witness's credibility or believability. Evidence of a prior conviction does not necessarily destroy or damage the witness's credibility and it does not mean the witness has testified falsely. It is simply one of the circumstances you may consider in weighing the testimony of a witness.[170]

Allen asserts that Williams' prior drug conviction played a critical role in this case, and that it incentivized Williams to testify consistently with the State's wishes.[171]  Allen emphasizes that the jury was permitted to consider evidence of Williams' convictions "**for the sole purpose of judging that witness's credibility or believability**."[172]  He asserts that the prior conviction has relevance beyond Williams' general credibility.  Specifically, he argues that the prior conviction exposed him to prosecution for illegally possessing a firearm giving him a motive to testify falsely in order to curry favor with the prosecuting authority having the power to charge him.[173]  Allen argues the Trial Counsel was ineffective in failing to object to the instruction limiting consideration of his felony conviction to

---

[170] Allen's Trial Tr. (November 20, 2018) at 160-161, D.I. 69.
[171] Mot. for Postconviction Relief at 51, D.I. 87.
[172] *Id.* (quoting Allen's Trial Tr. (November 20, 2018) at 161).
[173] *Id.* at 50-59.

Williams' general credibility. Instead, Trial Counsel should have proposed an instruction that allowed the jury to consider Williams' conviction for the specific purpose of judging his credibility, bias, motive, or incentive to lie in this case.[174]

Allen made this identical jury instruction argument on direct appeal, but because it was not raised in this Court, Allen was limited to arguing it under a plain error standard.[175] That standard requires the error to be "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[176] "Plain error is limited to material defects which are apparent on the face of the record; which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[177] Applying that standard, the Delaware Supreme Court rejected Allen's argument.[178] Here, he couches the argument as an IAC claim, which requires the Court to apply *Strickland's* reasonable probability of a different result standard.

The two standards are not the same, and as Allen correctly points out, plain error prejudice can be a "'more exacting'" standard the *Strickland* prejudice standard.[179] Even so, "prior appellate review of the error underlying an ineffective

---

[174] *Id.*
[175] *Allen,* 2021 WL 3012892, at *4-6.
[176] *Id.* at *4.
[177] *Id.*
[178] *Id.*
[179] Reply to State's Resp., at 6-7, (quoting *State v. Jones*, 2022 WL 2827004, at *10 (Del. Super. Ct. Jul. 20, 2022), D.I. 93.

assistance of counsel claim may render the ineffective assistance of counsel claim 'futile.'"[180]   "Prior review of a claim – may 'implicitly reject [ ]' the merits of a 'follow-on' ineffective assistance allegation that is based on the same claim or a variant of it."[181]   "[T]he follow-on claim still may 'fare no better' than its 'direct appeal precursor."[182]

On direct appeal, Allen relied on three cases – *Davis v. Alaska*,[183] *Weber v. State*,[184] and *Reid v. State*.[185] The Delaware Supreme Court discussed each one.[186] It found that all three were "distinguishable and inapplicable" and "[n]one of the cases have anything to do with jury instructions."[187]   It found that not only did Allen's Trial Counsel present evidence that allowed the jury to "assess Williams' general credibility and any bias, motive, and incentive to be untruthful in this specific case," but the witness's conviction of a crime instruction, together with the instruction on witness credibility "plainly gave the jury full range to consider whether Williams' prior felony conviction gave him a motive or incentive to make

---

[180] *Jones,* 2022 WL 2827005 at *7 (quoting *Green v. State,* 238 A.3d 160, 176 (Del. 2020).
[181] *Id.* (quoting *Green*, 238 A. 3d at 177-78).
[182] *Id.* (quoting *Green* 238 A.3d at 177).
[183] 415 U.S. 308 (1974).
[184] 457 A.2d 674 (Del. 1987).
[185] 888 A.2d 232 (Del. 2005).
[186] *Allen,* 2021 WL 3012892, at *5-6.
[187] *Id.* at 6.

up a story which portrayed him as the victim in an attempt to shift law enforcement's attention away from prosecuting him for possessing a firearm."[188]

On postconviction relief, Allen relies substantially on the same three cases the Supreme Court found to be "distinguishable and inapplicable." – *Davis*, *Weber*, and *Reid*.[189] To the extent he cites other cases, those cases are also distinguishable or inapplicable because they deal with counsel's failure to object to incorrect statements of the law.[190] Here the jury instructions given by the Court correctly state the law. The Court finds that the prior appellate review of this claim implicitly, if not explicitly, rejected the merits of Allen's follow-on IAC allegation. Allen has failed to show that Trial Counsel's performance was deficient or that he suffered prejudice such that there was a reasonable probability of a different result.

### 3. Failure to Request a Jury Instruction that Williams' Testimony Should be Received with Great Care and Caution.

Allen asserts Trial Counsel was ineffective in failing to request an interested witness instruction to the effect that Williams' testimony should be viewed with caution.[191] He references *Bland v. State*[192] and *Brooks v. State,*[193] cases involving accomplice testimony where failure to give an accomplice testimony instruction is

---

[188] *Id.*
[189] Mot. for Postconviction Relief, at 50-59, D.I. 87.
[190] *See, Id.* at 57.
[191] Mot. for Postconviction Relief at 60-65, D.I. 87
[192] 263 A.2d 286 (Del. 1970).
[193] 40 A.3d 346 (Del. 2012).

48

plain error, a New Jersey pattern jury instruction for "Testimony of a Cooperating Co-Defendant or Witness," and a model charge from the Third Circuit.[194]

Again, Allen raised the identical issue on direct appeal under a plain error standard.[195] He cited both *Bland* and *Brooks* and the same New Jersey and Third Circuit instructions.[196] The Delaware Supreme Court noted in rejecting this claim that in Delaware, "the giving of a cautionary instruction for specific witness testimony has not been extended beyond the witness who claims to have been an accomplice of the defendant."[197] Given the state of the law in Delaware, there is no reason to believe that a request for an interested witness instruction, if made by Trial Counsel, would have been successful. Under those circumstances, Trial Counsel's performance was not deficient and Allen suffered no *Strickland* prejudice.

### C. Alleged *Brady* Violation.

After his direct appeal, Allen retained a private investigator who interviewed Williams on July 17, 2022 over the telephone.[198] In that interview, Williams

---

[194] Mot. for Postconviction Relief, at 62-64, D.I. 67.
[195] *Allen,* 2021 WL 3012892, at *7.
[196] *Id.*
[197] *Id.*
[198] *See* July 17, 2022 audio interview between Williams and Allen's private investigator.

mentioned that he read one of Allen's appeals.[199]   Then, regarding any type of immunity or cooperation agreement to testify for the State at trial, Williams stated:

> Andrew Allen was one-hundred percent wrong. He has this belief … that I was under some type of cooperation agreement with the State Police of Delaware and I was not … They never charged me. They never said they were going to charge me. They never threatened to charge me. They never acted like they were going to charge me. The only reason that I believe that he thinks that I was cooperating and went on the stand [is] because [he believes] they were giving me - - they were making me do it or they were going to arrest me.[200]

In an August 28, 2015 interview between Williams and Det. Rizzo, Det. Rizzo pointed out that police recovered a bullet from Williams' home that appeared to be fired from a revolver.[201]  Det. Rizzo then asserted that there must have been at least three guns involved during the home invasion because the two guns collected at the crime scene were not revolvers.[202]  The following dialogue ensued:

> DET. RIZZO: Were any of them yours?
>
> WILLIAMS: No.
>
> DET. RIZZO:  Ok, I'm just going to ask you flat out. Did you happen - - This doesn't change the investigation in any way. Did you shoot either one of these guys?
>
> WILLIAMS: Yes I did.

---

[199] *Id* at. 4:30-5:00.
[200] *Id.* at 4:30-5:30.
[201] Aug. 28, 2015 video interview between Williams and Det. Rizzo, at 25:00-25:30.
[202] *Id.*

DET. RIZZO: You shot him?

WILLIAMS: Yes I did.[203]

…

DET. RIZZO: It's not like you're on the street … and some guy gives you a dirty look and you pull [the trigger]. These guys come into your house … I get where your concern is because you're a felon. You're a convicted felon. You're not supposed to have a gun. I get that. But it's kind of a different set of circumstances here[.][204]

This interview was ***not*** suppressed by the State.

Nearly seven years later, after that interview with Det. Rizzo, Williams responded to a telephone interview with Allen's private investigator. Importantly, Williams told the investigator near the outset of this interview, that he "has seen the police report and everything that they asked me is in that police report[,]" and that he "can't even remember what went on in that interview [with Det. Rizzo] … what the interview was about, what [Det. Rizzo] asked me or how it went. I don't even know without … reading Det. Rizzo's personal notes."[205]

Allen relies on a later portion of that interview to support his *Brady* allegation:

When I said that [I had a gun] to [Det. Rizzo], when I said that to him, he said, "there's not a judge in the world

---

[203] *Id.* at 25:00-26:00.
[204] *Id.* at 29:00-29:30
[205] *Id*. at 3:30-4:30.

51

that would convict you or prosecute you for standing up when some people come into your house to do bodily harm to you." There is such a thing as the Castle Doctrine, where this is my castle, and I have every right to defend my castle in any means necessary and any other extenuation circumstances get thrown out the window because it was my house and if they had not come into my house to try to bodily, inflict bodily harm upon me I wouldn't have had to shoot them with a gun that I wasn't supposed to have. They could have kept their asses on the other side of my door and we wouldn't have had any problem. But they chose not to do that, so I was well within my rights to defend my rights to defend my castle, my safety in my humble abode, in any manner that I please, that I deem necessary. And for that, he was like "you will never be charged for that because you are the victim in this, and we are not going to charge the victim.[206]

Based on this portion of Williams' interview with his investigator seven years after Williams spoke to Det. Rizzo, and despite Williams' disclaimer that he lacked specific recollection of his interview with Det. Rizzo, Allen argues that the State suppressed a promise it made to Williams that he would not be prosecuted for illegally possessing a firearm.[207] Further, Allen contends that the State wrongly "doubled down" on its insistence that it was unaware of any discussion with Williams by law enforcement not to prosecute him in its briefing in the Supreme Court.[208]

---

[206] Mot. for Postconviction Relief, at 42-43 (citing Appendix at A47), D.I. 87.
[207] *Id.*
[208] *Id.* at 41.

As noted above, the Court finds that it would be helpful to have a more complete record before it in deciding this issue. Accordingly, Allen's request for an evidentiary hearing on his *Brady* claim is **GRANTED.** Because any factual support for Allen's *Brady* claim is limited to his contention that the State suppressed assurances made by Det. Rizzo to Williams that Williams would not be prosecuted for illegally possessing a firearm, so too the evidentiary hearing will be limited to that contention.

### D.    Cumulative Effect.

Allen has not succeeded on his jury instruction claims or his claim that Trial Counsel was ineffective in ignoring a comment he made in his interview with Det. Rizzo. Thus, his argument the cumulative effect of the multiple errors he alleges warrant reversal of his convictions loses its force. Further, if Allen succeeds on either of his remaining claims, his convictions will be reversed on that basis alone. Accordingly Allen's request to reverse his convictions due to the cumulative effect of his claimed errors is **DENIED**.

### VI.    CONCLUSION

For the foregoing reasons, Allen's Motion for Postconviction Relief is **GRANTED in part**, but only as to his request for an evidentiary hearing on his claims that: (1) Trial Counsel was ineffective in failing to call as witnesses Alexander Manoogian and Lyndee Baldwin; and (2) the State violated its *Brady*

53

obligations. Further, the hearing on Allen's *Brady* claim is limited to his contention that the State suppressed assurances made by Det. Rizzo to Troy Williams that Williams would not be prosecuted for illegally possessing a firearm.. In all other respects, the Motion is **DENIED.**

**IT IS SO ORDERED.**

/s/ *Ferris W. Wharton*
Ferris W. Wharton, J.

54